DECISION AND JUDGMENT ENTRY
{¶ 1} Plaintiffs-Appellants, Rhonda Galyean and Debra Cunningham, appeal from the Washington County Common Pleas Court's grant of summary judgment in favor of Appellees on several claims contained in their joint complaint. Appellants allege that 1) the trial court erred in granting summary judgment in favor of Appellees on their whistleblower claims; 2) the trial court erred in granting Appellee, Selby Hospital's, motion for summary judgment on Appellant, Rhonda Galyean's wrongful discharge claim; and 3) the trial court erred in granting Appellees' motions for summary judgment on Appellants' defamation claims. Because we find Appellants' failed to meet all the requirements in order to invoke protection under Ohio's whistleblower statute, which requires strict compliance, and Appellant Galyean failed to establish a public policy independent of that contained in the whistleblower statute to support her wrongful discharge claim, we overrule Appellants' first and second assignments of error. Further, because we find that the Appellants failed to establish the existence of genuine issues of material fact related to their defamation claims, we believe the trial court properly granted summary judgment on these claims. Accordingly, we affirm the trial court's grant of summary of judgment in favor of Appellees on all claims appealed herein.
 {¶ 2} Selby General Hospital ("Selby") contracts with Quorum Health Resources, LLC ("Quorum") to provide management services within its facility. In order to fulfill this function, Quorum placed Maryann Greenwell at Selby to serve as its CEO. Maryann Greenwell, on behalf of Selby, hired several "senior staff members" including Appellant Cunningham, who was hired pursuant to a three-year employment agreement with Selby on October 26, 1999. She was hired to fill the position of Vice President, Strategic Development. The employment agreement specified that Appellant Cunningham would be provided with secretarial services. Appellant Galyean was subsequently hired by Selby to perform secretarial services for Appellant Cunningham and took on the additional responsibility of Credentials Coordinator on March 1, 2001. Appellant Galyean was considered an at-will employee, contrary to Appellee Cunningham.
 {¶ 3} Appellants Galyean and Cunningham remained employed with Selby until their terminations, which serve as the basis of this litigation. Appellants contend that they were terminated in retaliation for reporting criminal activity and safety hazards in violation of R.C.4113.52 and in violation of Ohio's public policy. Appellees assert that Appellant Galyean was merely laid off in connection with a reduction in staff, but was later categorized as ineligible for rehire due to performance deficiencies discovered after her departure. Appellees assert that Appellant Cunningham was terminated as a result of conduct which occurred prior to being placed on leave and also conduct that was discovered after she was placed on leave.
 {¶ 4} On November 27, 2002, Appellants filed an amended complaint which included claimed violations of Ohio's whistleblower statute, wrongful discharge, and defamation.[1]
 {¶ 5} Appellees moved for partial summary judgment, claiming that Appellants' whistleblower claims and public policy claims were barred. Specifically, Appellees argued that Appellants could not "identify any state or federal statute, ordinance or regulation of a political subdivision that would preclude the reported activity," nor could they identify any work rule or company policy that would prevent the reported activity (in this case, backdating of physician credentials). Appellees further argued that the Appellants could not meet the other requirements of the whistleblower statute, which requires that the employee "reasonably believe that the alleged violation is a criminal offense likely to cause an imminent risk of physical harm to persons or hazards to public health or safety or is a felony."
 {¶ 6} With regard to Appellant Galyean's wrongful discharge in violation of public policy claim, Appellees argued, in their motions for partial summary judgment, that Appellant failed to set forth a clear public policy in support of her claim. Appellees also moved for summary judgment on Appellants' defamation claims, arguing that the statements at issue were privileged communications, and, therefore, were not defamatory.
 {¶ 7} With respect to Appellants' whistleblower claims, the trial court found that affidavits filed in support of Appellants' memorandum in opposition to Appellees' motions for partial summary judgment, conflicted with their previous deposition testimony. Specifically, the trial court found that Appellants' testified in their depositions "that they had never seen any criminal activity at the hospital and that there was no hazard to public health or safety that resulted from the actions complained of." However, the trial court also found that "[i]n an affidavit they then reversed their position[,]" and further added that "[t]he court will not give credence to the affidavits filed to create an issue of fact contradicted by previous testimony." The court also held that "[e]ven if this practice [allowing uncredentialed and uninsured physicians to work in the emergency room] could give rise to some criminal charge as a result of billing for uncredentialed physicians to Medicaid and/or Medicare, there is no indication of any reasonable belief that this practice `created an imminent risk of harm to persons,' nor that it would be a felony."
 {¶ 8} In regards to Appellant Galyean's wrongful discharge claim, the trial court found that each and every statute cited by Appellant in support of her claim was either too broad, insufficiently specific, or completely inapplicable to her claim, and, therefore granted summary judgment in favor of Appellees.
 {¶ 9} Similarly, the court held that the Appellants' defamation claims failed for two reasons: 1) the statements do not identify Appellant Galyean specifically and 2) "the statements were made subject to a qualified privilege because the statements were made as part of the communications between corporate officers, management and employees concerning another employee's job performance and are privileged absent actual malice." On appeal, Appellants assert the following assignments of error.
 {¶ 10} "I. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF ALL DEFENDANTS-APPELLEES AND AGAINST BOTH PLAINTIFFS-APPELLEES (SIC) ON THEIR WHISTLEBLOWER CLAIMS.
 {¶ 11} II. HE TRIAL COURT ERRED IN GRANTING DEFENDANTS-APPELLEES MOTIONS FOR SUMMARY JUDGMENT ON GALYEAN'S WRONGFUL DISCHARGE CLAIM.
 {¶ 12} III. THE TRIAL COURT ERRED IN GRANTING DEFENDANTS-APPELLANTS'(SIC) MOTIONS FOR SUMMARY JUDGMENT ON APPELLEES' (SIC) DEFAMATION CLAIMS.
 {¶ 13} It is well-settled that appellate courts review summary judgments de novo. See Broadnax v. Greene Credit Service (1997),118 Ohio App.3d 881, 887, 694 NE.2d 167; Coventry Twp. V. Ecker (1995),101 Ohio App.3d 38, 41, 654 N.E.2d 1327. In other words, appellate courts afford no deference to a trial court's summary judgment decision, seeHicks v. Leffler (1997), 119 Ohio App.3d 424, 427, 695 N.E.2d 777;Dillon v. Med. Ctr. Hosp. (1993), 98 Ohio App.3d 510, 514-515,648 N.E.2d 1375; Morehead v. Conley (1991), 75 Ohio App.3d 409, 411-412,599 N.E.2d 786, and conduct an independent review to determine if summary judgment is appropriate. Woods v. Dutta (1997), 119 Ohio App.3d 228,233-234, 695 N.E.2d 18; McGee v. Goodyear Atomic Corp. (1995),103 Ohio App.3d 236, 241, 659 N.E.2d 317.
 {¶ 14} Summary judgment is appropriate when the following have been established: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in its favor. Bostic v. Connor (1988),37 Ohio St.3d 144, 146, 524 N.E.2d 881, citing Harless v. Willis Day WarehousingCo. (1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46. See, also, State exrel. Coulverson v. Ohio Adult Parole Auth. (1991), 62 Ohio St.3d 12, 14,577 N.E.2d 352; Civ.R. 56(C). The burden of showing that no genuine issue exists as to any material fact falls upon the party requesting summary judgment. Mitseff v. Wheeler (1988), 38 Ohio St.3d 112, 115,526 N.E.2d 798.
 {¶ 15} If the moving party satisfies this burden, "the nonmoving party then has a reciprocal burden under Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial, and if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." Kulch v. Structural Fibers,Inc. 78 Ohio St.3d 134, 145, 1997-Ohio-219, 677 N.E.2d 308, citingDresher v. Burt (1996), 75 Ohio St.3d 280, 295, 662 N.E.2d 264. In responding to a motion for summary judgment, the nonmoving party may not rest on "unsupported allegations in the pleadings." Harless,54 Ohio St.2d at 66. Rather, Civ.R. 56 requires the nonmoving party to respond with competent evidence that demonstrates the existence of a genuine issue of material fact. Specifically, Civ.R. 56(E) provides:
 {¶ 16} " * * * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party."
 {¶ 17} Consequently, once the moving party satisfies its Civ .R. 56 burden, the nonmoving party must demonstrate, by affidavit or by producing evidence of the type listed in Civ.R. 56(C), that a genuine issue of material fact remains for trial. A trial court may grant a properly supported motion for summary judgment if the nonmoving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that there is a genuine issue for trial. SeeDresher, 75 Ohio St.3d at 293; Jackson v. Alert Fire Safety Equip.,Inc. (1991), 58 Ohio St.3d 48, 52, 567 N.E.2d 1027. With these principles in mind we turn our attention to the case at hand.
 {¶ 18} In their first assignment of error, Appellants argue that the trial court erred in granting summary judgment in favor of all Appellees on their whistleblower claims. In support of this assignment of error, Appellants specifically argue that 1) the trial court erred in rejecting their affidavits, which they argue were not in conflict with their deposition testimony; 2) even if the affidavits conflicted with the deposition testimony in part, the trial court erred in rejecting the affidavits in their entirety; 3) the trial court erred in granting Appellees' motions for summary judgment on their whistleblower claims because material questions of fact remained at issue; 4) the trial court erred in finding facts and drawing inferences therefrom in favor of the moving parties instead of in favor of Appellants; and 5) the trial court misapplied the requirements of the Ohio Whistleblower statute to the facts at issue in this case and thereby erred in granting Appellees' motions for summary judgment.
 {¶ 19} Appellants brought claims under R.C. 4113.52, otherwise known as Ohio's whistleblower statute. R.C. 4113.52 provides in pertinent part, as follows:
 "(A)(1)(a) If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation either is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety or is a felony, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation. If the employer does not correct the violation or make a reasonable and good faith effort to correct the violation within twenty-four hours after the oral notification or the receipt of the report, whichever is earlier, the employee may file a written report that provides sufficient detail to identify and describe the violation with the prosecuting authority of the county or municipal corporation where the violation occurred, with a peace officer, with the inspector general if the violation is within the inspector general's jurisdiction, or with any other appropriate public official or agency that has regulatory authority over the employer and the industry, trade, or business in which the employer is engaged.
 * * *
 (3) If an employee becomes aware in the course of the employee's employment of a violation by a fellow employee of any state or federal statute, any ordinance or regulation of a political subdivision, or any work rule or company policy of the employee's employer and the employee reasonably believes that the violation either is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety or is a felony, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with the supervisor or officer a written report that provides sufficient detail to identify and describe the violation."
 {¶ 20} The statute further provides in section(3)(B) that "no employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by divisions (A)(1) or (2) * * * [or] by division (A)(3) of this section if the employee made a reasonable and good faith effort to determine the accuracy of any information so reported * * *." "In order for an employee to be afforded protection as a `whistleblower,' such employee must strictly comply with the dictates of R.C. 4113.52. Failure to do so prevents the employee from claiming the protections embodied in that statute." Contreras v. Ferro Corp.
(1995), 73 Ohio St.3d 244, 652 N.E.2d 940, paragraph one of the syllabus.
 {¶ 21} In the case sub judice, Appellants reported several actions by both their employer and also fellow employees, to Quorum, Selby's management company, and specifically to Quorum's compliance officer. Appellants' first amended complaint alleges the following: 1) that they internally reported both orally and in writing "conditions and activities existing at Selby General Hospital that jeopardize the stability of the Hospital and the health and safety of members of the general public;" 2) "Defendant Greenwell, in particular, has resisted taking action to remedy the conditions and activities that have placed the Hospital and patients in jeopardy;" 3) that the hospital "in violation of law, permitted a physician who was not credentialed by the Hospital to perform a surgery in the Hospital's surgical suite;" 4) that in response Appellants were directed to backdate that physician's credentials to cover the procedure that was performed; 5) that three days after Appellants reported this conduct to Quorum's compliance officer, they were advised their department was being eliminated due to budgetary constraints; and, finally 6) that Appellants reasonably believed and continue to believe that the actions of backdating physician credentials and other violations, were violations of state and federal law likely to cause imminent risk of physical harm to persons or a hazard to the public health and safety.
 {¶ 22} However, in their depositions, Appellants' reasons for reporting this conduct unequivocally related to liability concerns for themselves and the hospital, rather than patient safety concerns. Appellant Cunningham was deposed over a period of four days, resulting in over one thousand pages of transcripts. During her deposition, she was asked a variety of questions regarding the criminal and safety violations that were alleged in the complaint and she testified at length regarding these issues. For instance, Appellant Cunningham testified, in pertinent part, as follows:
"Q: With reference to document number 131, are you aware of any illegal activity which took place in the women's health services?
A: Illegal? No.
Q: Inappropriate? Improper?
A: What I believe to be improper, yes." (Emphasis added).
 {¶ 23} With regard to billing Medicare for services performed by one physician, but billing under another physician's name, Appellant Cunningham testified as follows:
"Q: Do you recall being aware of any billing at the hospital being done under another doctor's name?
A: That Paula did?
Q: Anyone.
A: I was only aware of the things that the physicians like Dr. Horton because of the questions that would be asked or if he would ask me to fill out an insurance form.
Q: What were you aware of?
A: The incident being the asking her to bill under a different physician's name.
Q: Okay. Other than that, are you aware of any similar situation occurring at the hospital?
A: That involved Paula Shephard?
Q: That involved anyone.
A: There was some things that I thought were questionable. I can't saythat they were illegal." (Emphasis added).
 {¶ 24} However, later, in reference to the same issue, but involving the chief financial officer, Tom Kelly, Appellant Cunningham testified as follows:
"Q: In — do you know of anything that Tom's done at the hospital that you consider to be illegal?
A: Yes.
Q: What has he done that you consider to be illegal?
A: He asked Paula Shepherd to bill underneath another doctor's name.
* * *
Q: Did you make a report to any outside agency about billing under another doctor's number?
A: No.
Q: Do you know if there was ever a report to any outside agency about billing under a different doctor's number?
A: Not to my knowledge.
Q: Do you know of anything else that Tom Kelley did or was involved in at Selby General hospital which in your opinion was illegal?
A: No." (Emphasis added).
 {¶ 25} With respect to her report about permitting uncredentialed physicians to work in the emergency room, Appellant Cunningham testified as follows:
"Q: So from May 9, 2001, until July 2, 2003, you had never reported any issue relating to the ER to anyone at Quorum; correct?
A: Only to Maryann until it got so bad that we were afraid we weregoing to be in trouble.
Q: It's your testimony, ma'am, that the reason you called Julia CostaBicmore on July 2, 2002, was that it had gotten so bad that you would bein trouble?
A: Yes" (Emphasis added).
 {¶ 26} Regarding potential Stark II[2] violations associated with providing physicians, who were not employees of the hospital, with certain benefits and/or perks in the form of paid health insurance, Appellant Cunningham testified as follows:
"Q: Do you know if he [Dr. Thomas] used his insurance card?
A: I don't know that if — if he used it. I knee (sic) that he had it. I know that the hospital was paying for it and he was not an employee.
Q: Okay. What did Maryann Greenwell do after you brought this to her attention?
A: I don't know that she did anything.
Q: Did you do anything other than this note to file after discussing it with Maryann Greenwell?
A: No, I did not.
Q: Do you know of anything illegal about the arrangement with Dr. Thomas?
A: I don't know that it's illegal, but she was saying that a physician was an employee when they weren't and they were getting insurance and the hospital was paying for it and the doctor should have been paying for it himself. It could be an enormous issue.
Q: Was Dr. Thomas admitting patients at the hospital?
A: Yes, he was." (Emphasis added)
 {¶ 27} With respect to her report to Maryann Greenwell that Tom Kelly allowed a physician without privileges to treat a patient in the emergency room on one occasion, Appellant Cunningham testified as follows:
"Q: Did you want her [Maryann Greenwell] to do something about this particular situation * * *?
A: Number one, I wanted to make sure that Tom had told her; and, number two, this is liability on the hospital's part, and I would think as a CEO that she would be greatly concerned that Tom Kelly allowed a physician to see a patient in the emergency room without privileges andput the hospital at risk" (Emphasis added).
 {¶ 28} At another point during her deposition, Appellant Cunningham attempted to explain her reasoning for her practice of exposing and correcting violations when found. Appellant Cunningham was questioned regarding a memo to Maryann Greenwell and testified as follows:
"Q: Page 1123, look at page 1122, I'm sorry, under paragraph C near the top, do you see that, when I came here?
A: Yes.
Q: I discovered that there were many federal violations and, yes, I did stick my nose in where employees thought I shouldn't have but by law in my position if I did not expose and correct these violations I couldbe personally fined and liable. " (Emphasis added).
 {¶ 29} With regard to her reasons for reporting several compliance concerns to Selby's compliance officer, Rebecca Nigh, Appellant Cunningham testified as follows:
"Q: Why was it on July 9 that you were going back over these issues?
A: I was probably doing follow-up or I was checking to see if something had happened from a compliance issue.
Q: Were you concerned about the hospital for were you just wanting to stir the pot on compliance issues?
A: I was concerned about myself." (Emphasis added).
 {¶ 30} In order for an employee to be protected by the provisions of the whistleblower statute, he or she must "reasonably believe that the violation either is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety or is a felony. Herrington v. Daimler Chrysler Corp. (N.D. Ohio, 2003), 262 F. Supp.2d 861; citing R.C. 4113.52(A)(1)(a). Based on her deposition testimony, Appellant Cunningham cannot support her claim that she reasonably believed that there was criminal activity taking place or that any of the reported activities were likely to cause imminent harm to persons or pose a hazard to public safety. Appellant Cunningham, when questioned, repeatedly stated that while she believed certain conduct was improper or unethical, she could not say that it was illegal. Also, she reiterated numerous times that her motivations for reporting were due to liability concerns and risks to the hospital and to herself, personally, not because of patient safety concerns.
 {¶ 31} The only testimony that arguably supports Appellant Cunningham's claim is as follows and was filed under seal:
"Q: * * * Do you know of any danger to the public health that Dr. Z presented by being in the emergency room?
A: Yes.
* * *
Q: What danger did you believe Dr. Z to pose to the emergency room patients by being there in the emergency room?
A: I am answering this question based on information that is confidential in his credentialing files that he has — reports to the data bank.
Q: What reports to the data bank?
A: He has reports to the data bank. I can't name them all, but they have to do with the well-beings of patients.
* * *
Q: Has he ever flunked a credentialing process?
A: Not at Selby.
* * *
Q: * * * Let me ask you this. Do you have an opinion as to whether or not Dr. Z would have received credentials for the emergency room if he had applied for those credentials?
A: It's my opinion that he would have been credentialed.
* * *
Q: The time that you processed that [Dr. Z's eventual emergency room credentials] through your office, did you believe that Dr. Z posed a risk to the emergency room patients?
A: Doesn't matter what I believe it. It matters if the medical credentialing committee approves him or not.
* * *
Q: Did you have an opinion?
A: Yes.
Q: And what was your opinion of Dr. Z's qualifications for the ER or suitability for credentials at the time your department processed his credentials?
A: He met the basic requirements. "
 {¶ 32} Although Appellant Cunningham initially stated that she had patient safety concerns related to Dr. Z's practicing in the emergency room, her testimony immediately following that initial statement does not support that conclusion.
 {¶ 33} Appellant Galyean's deposition testimony follows the same spirit as that of Appellant Cunningham with respect to her reasons for reporting alleged misconduct. Appellant Galyean's deposition testimony provides as follows:
"Q: * * * Do you know of any harm that came to patients because Drs. Merrill, Waters, and Spencer did not have technical privileges for the ER?
A: To patients?
Q: (Nodding head.)
A: I do not know.
Q: Do you know of any other harm?
A: No" (Emphasis added).
 {¶ 34} With respect to the alleged criminal violations, Appellant Galyean testified as follows:
"Q: Do you know of any instance where a physician was given illegal benefit, given something that they shouldn't have, either money or office space or computer equipment or special privileges, anything like that?
A: No.
* * *
Q: Do you know of any situation where the hospital overbilled Medicare or Medicaid?
A: I don't.
* * *
Q: It looks like you have gone through and identified various members of management?
A: Yes.
Q: CEO, the CFO, the CCO, and the director of surgery?
A: Yes.
Q: Do you believe that any of these individuals committed crimes while they were — while you worked there at the hospital?
A: I don't know.
Q: Did you ever suspect that Maryann Greenwell, Nancy Chandler, Tom Kelly, or Mark Mattes were guilty of any criminal acts?
A: No."
 {¶ 35} However, despite the above quoted deposition testimony, both Appellants filed affidavits in support of their memorandums in opposition to Appellees partial motions for summary judgment, which, in the view of the trial court, contradicted their deposition testimony. Pertinent provisions of those affidavits are set forth as follows.
By Appellant Cunningham:
 "8. With respect to the several occasions where I objected to Selby officials permitting uncredentialed physicians to work in surgery or in the emergency room, I had several concerns, including patient safety and welfare and protecting Selby from potential liability.
 9. For example, I am aware that both the state of Ohio and the federal government carefully regulate services provided by Hospitals and by physicians, and it is my belief that permitting an uncredentialed physician to practice in a Hospital is a violation of federal and state law.
 * * *
 14. Although I cannot identify a specific injury that was inflicted upon any patient at Selby by a physician practicing without proper credentials, I am convinced that permitting uncredentialed physicians to practice medicine at Selby was dangerous to the health and safety of the public and, if allowed to continue, will inevitably result in harm."
Appellant Galyean's affidavit states as follows:
 "7. Based upon my knowledge and training, I believe that permitting physicians to practice without proper credentials is against the law and is a danger to the health and safety of Selby patients. I also know that permitting physicians without credentials to practice at Selby is a violation of Selby policy.
 * * *
 10. The reports I made to various officials at Selby and at Quorum about improper credentialing reflected my concern that persons at Selby were violating the law, as well as hospital policy, and that their violations posed an imminent risk of harm to the public."
 {¶ 36} In our view, Appellants' affidavits are clearly inconsistent with their earlier deposition testimony. "Generally, a nonmoving party cannot defeat a motion for summary judgment by submitting an affidavit which, without good explanation, contradicts that party's previous deposition testimony." Mollett v. Million Dollar General Corp., Scioto App. No. 04CA2941, 2005-Ohio-589 at ¶ 17; citing Sterner v. Sterner
(July 12, 1995), Scioto App. No. 93CA2191, 1995 WL 416941, citingCrosswhite v. Desai (1989), 64 Ohio App.3d 170, 580 NE.2d 1119;Brannon v. Rinzler (1991), 77 Ohio App.3d 749, 603 N.E.2d 1049; PainEnt. Inc. v. Wessling (Mar. 22, 1995), Hamilton App. No. C-930888,1995 WL 121459; McCain v. Cormell (June 30, 1994), Trumbull App. No. 93T-4967, 1994 WL 320915; Bellian v. Bicron Corp. (Dec. 18, 1992), Geauga App. No. 92-G-1695, 1992 WL 387354.[3]
 {¶ 37} However, this is not a complete bar to the consideration of an affidavit that contradicts prior deposition testimony. Mollett at ¶ 17. "A court may consider a contradictory affidavit where the affiant can provide a legitimate reason for the contradiction, including, but not limited to, affiant's confusion at the time of the deposition, or affiant's previous lack of access to material facts coupled with affiant's averment of newly discovered facts." Id.; See, e.g., Push v. A-Best Prod. Co. (Apr. 18, 1996), Scioto App. No. 94CA2306, 1996 WL 192968 at fn. 8; Bulishak v.Finast Supermarkets (Mar. 19, 1992), Cuyahoga App. No. 62301,1992 WL 55835.
 {¶ 38} This approach was recently reaffirmed, and to some extent extended, by the Supreme Court of Ohio in Byrd v. Smith, 110Ohio St.3d 24, 2006-Ohio-3455, 850 NE. 2d 47. In Byrd, the Court held that "[w]hen determining the effect of a party's affidavit that appears to be inconsistent with the party's deposition and that is submitted either in support of or in opposition to a motion for summary judgment, a trial court must consider whether the affidavit contradicts or merely supplements the deposition." The Court further reaffirmed that "[a]n affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat the motion for summary judgment." Byrd, supra, at paragraph three of the syllabus.
 {¶ 39} Here, Appellants argue on appeal that their affidavits do not directly conflict with their deposition testimony. They argue that they were asked about specific harms to specific patients, inflicted by specific individuals, while their affidavit testimony speaks more generally to the potential harms associated with the practice of permitting uncredentialed physicians to practice at Selby. We are not persuaded by Appellants' argument.
 {¶ 40} Aside from the direct and specific questions that were asked during depositions, Appellants were also asked general questions, in which they had ample opportunity to expound upon the alleged criminal violations and safety concerns. For instance, Appellant Cunningham was questioned as follows:
"Q: * * * The compliance concerns that you are referring to in this letter [the letter reporting concerns to Quorum], I suspect that those are compliance concerns that we've discussed over the last few days; is that correct?
A: Yes.
Q: Is there any compliance issues that we have not discussed that you can think of?
A: The compliance issues that are in this letter addressed to Joe Beck we've already discussed.
Q: Okay. So everything's in this, everything — we've discussedeverything then?
A: Yes.
* * *
Q: In your complaint there's allegations that Selby and the other defendant's violated state and federal laws. And at any time during your employment with Selby did you ever have cause to go to the police about any activity at Selby?
A: No.
Q: The assistant prosecutor or prosecutor?
A: No.
Q: The FBI?
A: No.
Q: Were you ever a witness to any criminal activity at Selby hospital?
A: No.
* * *
Q: Okay. And Mr. Williams mentioned going to the police, going to the prosecutor, and things like that. I understand that with hospital compliance issues you can be — receive civil penalties or have your accreditation — get in trouble with your accreditation. Did you think that Maryann Greenwell should have gone to jail for anything that you saw or heard going on at Selby General Hospital?
A: I didn't have that thought one way or the other.
Q: All right. Did you have the thought that either mark Mattes or Tom Kelly should have gone to jail over anything happening at Selby General Hospital?
A: I didn't have that thought one way or the other.
Q: Did you ever think during the time that you were employed at SelbyGeneral Hospital that people like Mark or Maryann or others at thehospital were violating the criminal statutes of either Ohio or theUnited States government?
A: No" (Emphasis added).
 {¶ 41} Appellant Galyean was also presented with a summary question during deposition, to which she responded as follows:
"Q: Do you know of any situation where a physician without privilegesposed some risk of harm to a patient because of anything that they were doing at the hospital?
A: No"
 {¶ 42} Here, we have later affidavits directly conflicting with previous deposition testimony. In keeping with the approach recently set forth in Byrd, supra, we conclude that the testimony contained in the affidavits is contradictory, and not merely supplemental to the deposition testimony. Further, because there is nothing in the record from Appellants that sufficiently explains the inconsistent evidence they submitted, we will not consider the affidavits in our analysis. Thus, in our view, the trial court properly granted summary judgment in favor of all Appellees on Appellants' whistleblower claims. The deposition testimony of both Appellants fails to establish a reasonable belief that any crimes had been committed and even if it did, there is no indication in the deposition testimony of either Appellant, that the report to Quorum was motivated by their concerns for public health or patient safety.
 {¶ 43} To the contrary, Appellants, especially Appellant Cunningham, were very clear as to their motivations for making a report to Quorum, and that motivation was liability concerns on the part of Selby hospital and themselves individually. Thus, because there exists no genuine issue of material fact regarding Appellants' reasonable beliefs at the time of the report and their motivations for reporting to Quorum were not protected by statute, Appellants failed to strictly comply with the Ohio's whistleblower statute and Appellees are entitled to judgment as a matter of law. Accordingly, we overrule Appellants' first assignment of error and affirm the trial court's grant of summary judgment in favor of all Appellees on Appellants' whistleblower claims.
 {¶ 44} In her second assignment of error, Appellant Galyean argues that the trial court erred in granting Appellee Selby's motion for summary judgment on her wrongful discharge claim. In support of this assignment of error, Appellant Galyean argues that 1) the trial court erred in holding that only the statutory bases for her wrongful discharge claim that she listed in her complaint could form the basis for her claim; 2) the trial court erred in finding there were no disputes of material fact concerning her wrongful discharge claim; and 3) the trial court erred in concluding that the factual underpinnings of her claim were insufficient to establish the jeopardy element of her wrongful discharge claim.
 {¶ 45} Under Ohio law, an employer may discharge an at-will employee for any reason as long as the discharge does not contravene a clear public policy. Greeley v. Miami Valley Maintenance Contrs., Inc. (1990),49 Ohio St.3d 228, 551 N.E.2d 981, paragraph two of the syllabus. See, also, Painter v. Graley (1994), 70 Ohio St.3d 377, 1994-Ohio-334,639 N.E.2d 51, paragraph two of the syllabus. If an employer's discharge of an at-will employee violates public policy, that employee may bring a cause of action for wrongful discharge in violation of public policy.Painter, supra. Appellant Galyean asserts that her claim for wrongful discharge in violation of Ohio public policy arises underGreeley and Painter, supra, as well as Kulch v. Structural Fibers,Inc., 78 Ohio St.3d 134, supra.
 {¶ 46} In Kulch, the Supreme Court of Ohio reaffirmed the test for determining whether a viable common-law cause of action for tortious wrongful discharge in violation of public policy exists. The elements that must be met, in order for a claim to be viable, are as follows:
1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element);
2. That dismissing employees under circumstances like those involved in the plaintiffs dismissal would jeopardize the public policy (the jeopardy element);
3. The plaintiffs dismissal was motivated by conduct related to the public policy (the causation element); and
4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).Kulch, supra, 78 Ohio St.3d at 150-151, citing Painter, supra,70 Ohio St.3d at 384, relying on H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-399.
 {¶ 47} In Kulch, the Supreme Court of Ohio also noted its prior holding in Collins v. Rizkana (1995), 73 Ohio St.3d 65, 70,1995-Ohio-135, 652 N.E.2d 653, "that the clarity and jeopardy elements of the tort of wrongful discharge are questions of law to be determined by the court," and that "[conversely, the causation and overriding justification elements are questions of fact for the trier-of-fact. "
 {¶ 48} In her Amended Complaint, Appellant Galyean alleged that she was wrongfully discharged in violation of public policy. Appellant Galyean alleged that the applicable public policies were contained in R.C. 3701(Department of Health), 3727 (Hospitals) and 4731 (Professions), as well as "administrative regulations adopted pursuant to those chapters." However, in her memorandum in opposition to the Appellee's motions for summary judgment, Appellant Galyean failed to advance her claim under R.C. 3701, but claimed pubic policy violations under R.C. 3727.06 (Hospitals/Admission and Supervision of patients), R.C. 3727.10 (Hospitals/Prohibitions on hospital conduct), R.C. 4731.143
(Physicians; Limited Practitioners/Notice of lack of malpractice insurance), and advanced new claims based on R.C. 4101.11 (Division of Industrial Compliance/Duty of employer to protect employees and frequenters), R.C. 4765.50 (Emergency Medical Services/Prohibitions; exceptions) and finally, 42 U.S.C. 11101, et seq. (Health Care Quality Improvement Act). The Appellees objected to Appellant's reliance on public policies not originally pled her original or amended complaint.
 {¶ 49} The trial court held that "[t]o the extent that the sections mentioned in her brief were not pled, and to which the Defendant's object, the Court finds that she cannot rely upon them. However, even if the sections were properly pled, none of the briefed sections support a claim for wrongful discharge in violation of public policy." Despite the court's holding, it went on to consider the newly claimed public policy arguments, which included R.C. 4101.11, 42 U.S.C. 11101, et seq., and R.C. 4765.50. With regard to R.C. 4101.11, which essentially deals with premises liability situations, the trial court held that "it is neither sufficiently specific, nor clearly related to the situation at hand, to be the basis for a claim such as this."
 {¶ 50} As to 42 U.S.C. 11101, et seq., the trial court held that it was a "general statement of policy [that] is too broad and insufficiently specific for the Court to find a clear expression of public policy that is implicated by the facts of this case." The trial court also held that the effective date of R.C. 4765.50 was "on or after November, 3, 2002," which was after the alleged discharge occurred. It further held, with regard to that statute, that "[t]here is nothing in the factual underpinnings of this case that in any way implicate this section of Ohio Law."
 {¶ 51} In her brief, Appellant Galyean claims that the trial court erred in holding that only the statutory bases for her wrongful discharge claim that she listed in her complaint could form the basis for her claim. In support of her assertion, she argues that she was "not required, either in her complaint or in her deposition, to point to a particular statute as the basis for her public policy claim," and that "all she is and was required to do is to identify facts that, if proven, constitute conduct that violated public policy." We are not persuaded by Appellant's arguments. The first element of a claim for wrongful discharge in violation of public policy is "[t]hat [a] clear public policy exist[s] and [is] manifested in a state or federal constitution, statute or administrative regulation, or in the common law." In her complaint, Appellant specifically names several statutes that she claims embody the public policy issues in her claim.
 {¶ 52} However, although the trial court stated that Appellant could not rely on sections [of the Ohio Revised Code and United States Code] not pled in her complaint, it went on to individually address each claim on the merits. We agree with the trial court's assessment that R.C.4101.11, R.C. 4765.50 and 42 U.S.C. 11101, et seq. are not sufficiently specific to serve as that basis for Appellant's claim. R.C. 4101.11
deals with traditional premises liability, not malpractice or medical negligence. 42 U.S.C. 11101, et seq., known as the Health Care Quality Improvement Act, at least the provision specifically set forth by Appellant, is primarily geared toward the promotion of effective peer review among physicians. It does not afford protection to hospital employees who report believed credentialing violations. Finally, R.C.4765.50, as the trial court correctly noted, did not become effective until November 3, 2002, which is after the events giving rise to this litigation. Therefore, that section is inapplicable to the facts sub judice, on its face.
 {¶ 53} We now turn our attention to the remaining claimed public policy violations that were originally pled and also advanced at the summary judgment stage, which include a claim based on R.C. 4113.51
(Ohio's whistleblower statute), as well as, R.C. 3727.06, R.C. 3727.10
and R.C. 4731.143. We first address Appellant's reliance on R.C.4113.52. In her brief, Appellant argues that "[t]o the extent the Court finds that Galyean may proceed to trial on her whistleblower claim, that conclusion is also sufficient to sustain Galyean's wrongful discharge claim." Appellant cites Kulch, supra, in support. However, the Supreme Court of Ohio, in Kulch, supra, also explained, citing its earlier reasoning in Contreras v. Ferro Corp. (1995), 73 Ohio St.3d 244,652 N.E.2d 940, that "an employee who fails to strictly comply with the requirements of R.C. 4113.52 cannot base a Greeley claim solely upon the public policy embodied in that statute." In light of our holding that Appellant's whistleblower claim fails, she cannot bring aGreeley claim based upon that statute. Therefore, Appellant's wrongful discharge in violation of public policy claim, based upon the public policy embodied in Ohio's whistleblower statute, in not a viable claim.
 {¶ 54} Although Appellant included R.C. Chapter 3727 in her complaint and specifically argued R.C. 3727.06 in her memorandum in opposition to summary judgment, in her appellate brief she sets forth five different bases for her claim, none of which include this statute. Therefore, we will not consider it as part of our analysis. R.C. 3727.10 deals with prohibitions on hospital conduct "on or after November 3, 2002." As with R.C. 4765.50, the trial court held that it was inapplicable to the facts sub judice because the events at issue occurred prior to the effective date of the statute. We agree with the trial court's assessment and also find that it is inapplicable.
 {¶ 55} R.C. 4731.143 provides, in pertinent part, that:
(A) Each person holding a valid certificate under this chapter authorizing the certificate holder to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery, who is not covered by medical malpractice insurance as defined in section3929.71 of the Revised Code, shall provide a patient with written noticeof the certificate holder's lack of such insurance coverage prior to providing nonemergency professional services to the patient."
 {¶ 56} The trial court held that this statute was inapplicable to the present facts because it did not prohibit uninsured physicians from treating patients, but rather, it specifically permitted treatment, as long the patient was notified of the lack of insurance. Also, the trial court noted that the statute excepted from its coverage "nonemergency" services provided to patients. The claimed violations here included physicians providing treatment in the emergency room at Selby Hospital. Not only do we agree with the trial court's reasoning on this issue, we believe there are additional reasons for this statute's inapplicability to the present facts. The statute requires that the person who possesses the valid certificate to practice medicine (i.e. physician) inform the patient of his/her lack of insurance coverage. In our view, this is physician duty, not a duty of the hospital, and therefore does not implicate the hospital in any way. As such, Appellant's reliance on this statute as an expression of public policy in support of her claim is misplaced.
 {¶ 57} We agree with the trial court's determination that none of the previously discussed statutes set forth a clear public policy in support of Appellant's wrongful discharge claim. As a result, the clarity element, which is the first of four elements required for a viable claim, has not been met. Because the clarity element is a question of law to be determined by the court, the failure to meet this element destroys the viability of the claim. Therefore, the trial court properly granted summary judgment to Appellee Selby on Appellant's claim.
 {¶ 58} We now consider Appellants' third and final assignment of error. Appellants argue that the trial court erred in granting Appellees' motions for summary judgment on their defamation claims. In support of this assignment of error, Appellants specifically argue that 1) the trial court erred in concluding that no actionable defamatory statements applied to Galyean and 2) the trial court erred in granting Appellees' motions for summary judgment on their defamation claims because material questions of fact existed regarding Appellees' claims of privilege and Appellants' claims of malice. Because the trial court granted summary judgment to Appellees on Appellants' defamation claims, the appropriate standard of review is de novo. See Broadnax v. GreeneCredit Service and Coventry Twp. V. Ecker, supra.
 {¶ 59} In their complaints and throughout their deposition testimony, Appellants seemingly hinged their claims on what ultimately turned out to be mere rumor, which was unable to be traced back to the Defendants. However, during the discovery portion of this case, Appellants assert additional testimony was obtained indicating Appellee Greenwell made comments, after Appellants were discharged and/or placed on leave, that Appellants concealed pertinent credentialing information related to a certain physician, referred to as Dr. A. Beginning at the summary judgment phase and continuing into appeal, Appellants now base their defamation claims on those comments, alleging that the comments were defamatory, were not privileged, and were made with malice.
 {¶ 60} In support of their defamation claims, Appellants primarily rely on the deposition testimony of three individuals, which include, Jim Phillippe, Treva Spurlock, and William Peoples. Jim Phillippe is a regional vice president with Quorum Health Resources. He directly supervised Maryann Greenwell at the times at issue. He testified as follows:
"Q: Okay. Let's talk about the — [Dr. A]. Tell me what your understanding of the [Dr. A] issue is.
A: Well, the part that concerned me is I learned that [Dr. A] had been summarily suspended from a medical staff, and I believe it was in Marquette, Michigan, and that this was not reported to the credentials committee or the medical staff or the board until after [Dr. A] had been credentialed.
Q: Okay. And what is the source of your knowledge?
A: Management.
Q: Management being Mrs. Greenwell?
A: Yep."
 {¶ 61} Treva Spurlock was Maryann Greenwell's secretary. Part of her duties included taking the minutes at the hospital's board meetings. She testified as follows:
"Q: * * * Did you ever hear Maryann Greenwell suggest that DebraCunningham had concealed or misrepresented the contents of [Dr. As] credentials file?
A: Yes.
Q: Tell me what you recall her saying.
A: Did not report what they had found in the database.
Q: And it was specifically Debbie didn't report that?
A: I don't know if it was Debbie or Rhonda.
Q: Okay. Do you recall who she said that to?
A: The board.
Q: Was that at a board meeting?
A: I cannot recall that, but I know it was mentioned.
Q: To several board members?
A: I can't recall that either. I just know that it was mentioned." (Emphasis added).
 {¶ 62} William Peoples serves on the board of Selby General Hospital. He testified as follows:
"Q: What facts do have then to support your feeling that you were not getting complete information?
A: I don't know that I have any facts. You asked me what my feeling was during her [Debra Cunningham] time there and that was the overall feeling that I had.
Q: Our feelings generally come from a source. You can't express to me what the source of your feeling is?
A: I guess not off hand.
Q: Did Ms. Greenwell, for example, ever suggest to you that you weren't getting straight information from Debbie?
A: I'm fairly confident that was discussed.
Q: So you are fairly confident that Ms. Greenwell suggested thatDebbie wasn't being truthful?
A: No. I'm not saying that. I'm saying that those discussions were had. Now, whether it came from Ms. Greenwell or from another board member or just the circumstances, I can't recall.
Q: So from your discussion with other board members and perhaps staff people, you came to the feeling that you weren't getting straight information from Debbie or you weren't getting complete informationfrom Debbie?
A: That's fair." (Emphasis added).
 {¶ 63} Defamation is defined as "[t]he act of harming the reputation of another by making a false statement to a third person." Black's Law Dictionary (8th ed. 2004). The four elements of defamation have been described as follows:
 " `(a) a false and defamatory statement concerning another;
 (b) an unprivileged publication to a third party;
 (c) fault amounting at least to negligence on the part of the publisher; and
 (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.' " Cassidy v. U.S. Health Corp. (1994), Scioto App. No. 2158, 1994 WL 88942; citing Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc. (1992), 81 Ohio App.3d 591, 611 NE.2d 955; relying on 3 Restatement of the Law 2d, Torts (1977) 155, Section 558; See, also, Tohline v. Central Trust Co., N.A. (1988), 48 Ohio App.3d 280, 284, 549 NE.2d 1223.
 {¶ 64} Appellees counter Appellants' assertions by arguing that none of the allegedly defamatory statements set forth by Appellants refers to Appellant Galyean and that, therefore, her claim must fail. The trial court agreed with Appellees, as do we. None of the above-quoted testimony refers to Appellant Galyean concealing information. The only person that mentions Appellant Galyean was Treva Spurlock, and her reference does not rise to the level of defamation. Appellees also argue that the statements themselves are not actionable statements because they are privileged. In response, Appellants argue that genuine issues of fact exist as to whether the statements were privileged and whether Appellee Greenwell acted with malice in making the statements.
 {¶ 65} For the purpose of reviewing the summary judgment, we assume that Appellee Greenwell's statements are defamatory. See Bell v.Horton, Ross App. No. 02CA2651, 2002-Ohio-7260. A person alleged to have published defamatory material may invoke the defense of qualified privilege in order to avoid liability. A B-Abell Elevator Co. v.Columbus/Cent. Ohio Bldg. Constr. Trades Council, 73 Ohio St.3d 1, 71995-Ohio-66, 651 N.E.2d 1283. A publication is qualifiedly privileged "where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performances of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons of certain facts, which he in good faith proceeds to do."Hahn v. Kotten (1975), 43 Ohio St.2d 237, 244, 331 N.E.2d 713.
 {¶ 66} In AB-Abell, the Supreme Court stated: "The defense of qualified privilege is deeply rooted in public policy. It applies in a variety of situations where society's interest in compensating a person for loss of reputation is outweighed by a competing interest that demands protection. Accordingly, the privilege does not attach to the communication, but to the occasion on which it is made. It does not change the actionable quality of the publication, but heightens the required degree of fault. This affords some latitude for error, thereby promoting the free flow of information on an occasion worthy of protection." A B-Abell Elevator Co., supra, at 8-9. (Emphasis added).
 {¶ 67} Accordingly, once the defense of privilege attaches, the plaintiff can only defeat the privilege by a clear and convincing showing that the defendant made the communication with actual malice. Id. at 11. Actual malice is defined as acting with knowledge that thestatements are false or acting with reckless disregard as to their truth or falsity. Jacobs v. Frank (1991), 60 Ohio St.3d 111, 573 N.E.2d 609, paragraph two of the syllabus; Hahn, 43 Ohio St.3d 237, paragraph two of the syllabus. (Emphasis added). In order to determine whether the defamatory statements are entitled to a qualified privilege, courts consider the circumstances under which they were made.
 {¶ 68} Here, the statements at issue were made in the employment context. Appellants' complaint alleges that "[a]ll of Defendant Greenwell's activities described herein were undertaken in the course and scope of her employment." Appellees argue that "[u]nder Ohio law communications between corporate officers, management, and employees concerning another employee's job performance are privileged absent actual malice," citing Evely v. Carlon Co., Div. of Indian Head,Inc. (1983), 4 Ohio St.3d 163, 165, 447 N.E.2d 1290. In Evely, the appellant conceded in his complaint that the allegedly defamatory statements were made by his employer, through its officers, within the scope of employment. On these facts, the Supreme Court of Ohio reasoned as follows: "[a]t the outset, it must be pointed out that all of the statements attributed to the officers of the appellee were made concerning the activities of the appellant arising out of his employment status with the company. None of these statements was directed to the appellant as an individual separate and apart from his employment. As such, the statements would be afforded a qualified privilege concerning matters of common business interest between the parties and, accordingly, there must be a showing that they were made with actual malice in order for the appellant to prevail. In this regard there must be evidence adduced by the appellant beyond the mere allegations contained in the complaint." Id.
 {¶ 69} In accordance with the holding in Evely, because Appellants alleged the statements at issue were made within the scope of employment, and because, based upon a review of the record it is clear that the statements were made to members of Quorum management and Selby's board[4], both of which have a common business interest, it is clear that the statements are privileged.
 {¶ 70} We must now consider Appellants' arguments that the statements were made with malice. Appellants claim, on appeal, that "there is abundant evidence of malice here." However, Appellants hinge their argument on Maryann Greenwell's history of untruthfulness, in general. Appellants, in their brief, state "[i]n this case, there is ample evidence to establish Greenwell's `malicious' attitude toward the truth, in general, and toward the truth surrounding Appellants' discharge, in particular." In support of their arguments, Appellants' cite Appellee Greenwell's falsification of her educational credentials and her reputation at Selby as an "inveterate liar." With regard to the statements at issue, Appellants argue that Appellee Greenwell "knew her statements about * * * concealing information about Dr. A. were fabrications." In support of this argument, they argue that they were initially informed they were being discharged due to budget considerations, but that Greenwell told others they were discharged because they had completed their objectives related to physician recruitment, and ultimately informed others that they had concealed information. Appellees, however, assert that it was not until Appellants were discharged that problems with the credentialing files were found, thereby leading to the statements about concealing information. We believe, based upon a review of the pertinent testimony, that although Appellees gave varying reasons for discharging Appellants, this inconsistency does not, in and of itself, provide the requisite showing of malice to defeat the privilege asserted by Appellees.
 {¶ 71} Appellants argue, with respect to defamation, that "[i]t is the publisher's attitude toward the truth, rather than [her] attitude toward the plaintiff, personally, that is important," citing Dupler v.Mansfield Journal Co. (1980), 64 Ohio St.2d 116, 118-120,413 N.E.2d 1187. As all Appellees herein properly note, Appellants misquoted the holding in Dupler. Instead, Dupler states as follows: "[a]ctual malice may not be inferred from
evidence of personal spite ill-will or intention to injure on the part of the writer. (citations omitted). Rather, the focus of the inquiry is on defendant's attitude toward the truth or falsity of the publication ** *" Id at 119. As such, Appellants' reliance on Dupler is misplaced.Dupler does not support Appellants' contention that a disregard for the truth, in general, rises to the level of malice with respect to a specific statement.
 {¶ 72} Because we believe that Appellants failed to show genuine issues of material facts exist with respect to whether Appellee Greenwell acted with actual malice sufficient to defeat a claim of privilege, their claims fail. Assuming we found any of the statements at issue applied to Galyean, which we do not, her claim would fail, just as Cunningham's claim fails, because the statements at issue were privileged and are, therefore, insufficient to sustain a claim of defamation. Accordingly, Appellants' third assignment of error is without merit and we affirm the decision of the trial court.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that the Appellees recover of Appellants costs herein taxed. The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as of the date of this entry.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
McFarland, P.J.: Concurs in Judgment and Opinion.
Kline, J.: Concurs in Judgment Only.
Abele, J. dissents.
[1] Appellants also brought claims for tortious interference with contract and breach of contract, which are not part of this appeal.
[2] 42 CFR Parts 411 and 424 Medicare Progam; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships (Phase II); Interim Final Rule governs Physician Self Referral and Anti-Kickback issues related to physician recruitment and retention by hospitals receiving payment for services from Medicare and Medicaid.
[3] We have, however, permitted consideration of the conflict when an affidavit has been filed that sufficiently explains the reason for the discrepancy. Fiske v. Rooney (1998), 126 Ohio App.3d 649,711 N.E.2d 239.
[4] A review of the pertinent testimony indicates that although Treva Spurlock, a secretary, heard Maryann Greenwell state that Appellants had concealed credentialing information, she either obtained this information by keeping the minutes at the hospital board meetings or overheard a discussion between Maryann Greenwell and other board members, possibly in Greenwell's office, which is adjacent to her office. Therefore, we are not persuaded by Appellants arguments that she should not have been privy to this information.